IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| MONEISHA M. VIERA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) CIVIL ACTION NO. 5:22-cv-327 (MTT) |
| THE SCOTTS COMPANY, LLC, et al., | ) ) ) |
| Defendants. | ) ) |

## ORDER

Defendants The Scotts Company, LLC and The Scotts Miracle-Gro Company (collectively, "Scotts") move for summary judgment on plaintiff Moneisha Viera's claims under the Americans with Disabilities Act ("ADA"). Doc. 24. For the following reasons, Scotts' motion for summary judgment (Doc. 24) is **GRANTED**.

### I. BACKGROUND[1]

In December 2017, Viera was hired as a "dispatcher" at Scotts' production facility in Jackson, Georgia. Docs. 24-2 ¶ 1; 27-1 at 1 ¶ 1. Scotts "produces and distributes … lawn care products." Docs. 24-2 ¶ 2; 27-1 at 1-2 ¶ 2. Scotts' Jackson Facility is the "highest-volume producing plant in the south." Doc. 24-6 ¶ 5. "During its 'busy' or 'peak' season (approximately mid-January through June)," the Jackson Facility

---

[1] Unless otherwise stated, these facts are undisputed and are viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The Court notes that Viera purports to "dispute" various facts but does not explain why she disputes these facts or how the cited evidence supports her contention. *See, e.g.,* Doc. 27-1 at 11 ¶ 30. It is not the Court's responsibility to piece together Viera's explanation based solely on record citations.

"operates 24 hours per day and ships roughly 120-140 loads per day."  Docs. 24-2 ¶ 2; 27-1 at 1-2 ¶ 2.

As a dispatcher, Viera was "responsible for assisting with overall freight management."  Docs. 24-2 ¶ 3; 27-1 at 1-2 ¶ 3.  "Her duties included: keeping track of and coordinating orders for delivery to ensure maximum efficiency and timely deliveries; assigning carriers to orders; advising customers on delivery schedules and order issues; maintaining and processing necessary records to ensure private fleet and contract carriers were in compliance with applicable regulations; working with production personnel to coordinate shipments; responding to inquiries from customers, truck drivers, and corporate personnel; and, negotiating freight rates."  Docs. 24-2 ¶ 3; 27-1 at 1-2 ¶ 3; *see also* Doc. 32-1.  These responsibilities required Viera to perform "manual" tasks.  Docs. 24-2 ¶¶ 4-5; 27-1 at 2 ¶¶ 4-5; 32 at 82:19-23.  For example, when Viera arrived at the office in the morning, she "would take the orders that" the facility received overnight from the printer, "sort them out if they had not already been sorted out by Amy Elrod," the office manager, and "color code them based on" delivery location and date.  Doc. 32 at 24:8-15.  Viera would then begin the "dispatching" process, which included assigning commercial carriers to loads, printing bills of lading ("BOL"), attaching the BOLs and any other labels to "pick tickets" (i.e., the cover page on printed orders), and placing the orders on "the board" (i.e., a large magazine rack with slots to organize outgoing orders).  Docs. 31 at 18:23-19:13, 20:25-21:4, 34:17-35:18; 32 at 25:1-26:6.

Viera was also responsible for revising hard copy orders to account for production shortages, requests from Scotts' sales staff, BOL regulations, and other

changes that arose during the dispatching process.  Docs. 31 at 36:2-13, 36:23-37; 32 at 25:21-26:6.  For example, if an order was overweight, which often happened, Viera would "cut" the order, which involved "manually crossing out" incorrect weight and pallet information, writing in the correct information, and posting the updated order on the board.  Doc. 32 at 26:11-27:2, 27:16-28:9.  If the sales staff wanted a particular order to go out sooner, Viera would "replace" an "order that [she] had already pulled" to go out for shipment that day in her stack of orders "with the one that [the salesperson] requested … to go out."  *Id*. at 29:5-25.  And if Viera needed to remove products from an order that she previously posted to the board, she would remove the order from the board, alter the product amount manually, repost the order to the board, and then make the corresponding change in "SAP," Scotts' online order processing software.  *Id*. at 37:5-13, 100:12-19.  While some changes were communicated through email or instant message, the plant facility supervisor and the shipping foreman often communicated changes verbally by visiting Viera's office or over a radio.  Docs. 31 at 28:9-14, 37:3-38:8; 32 at 24:21-25, 35:12-18.

In August 2021, Viera informed Scotts that she contracted COVID-19 and was hospitalized.  Docs. 27-1 at 15 ¶ 3; 36 ¶ 3.  Viera was later diagnosed with "chronic respiratory failure and [] was prescribed supplemental oxygen therapy."  Docs. 27-1 at 15 ¶ 4; 36 ¶ 4.  "Unable to return to work during this time, Viera requested and was granted leave under the Family and Medical Leave Act ('FMLA')."  Docs. 24-2 ¶ 9; 27-1 at 4-5 ¶ 9.  After exhausting her FMLA leave in November 2021, Viera "sought and was granted an additional leave of absence."  Docs. 24-2 ¶ 9; 27-1 at 4-5 ¶ 9.

While on leave, Viera "performed a limited number of job duties from home."[2] Docs. 24-2 ¶ 9, at 3 n.2; 27-1 ¶ 9; 31 at 51:7-16; 32 at 127:16-128:12.  Once Scotts learned Viera "was performing certain tasks from home during her leave, it immediately instructed her to stop doing so."   Docs. 24-2 at 3 n.2; 31 at 51:7-16.

On January 24, 2021, Viera emailed "corporate support employee Kristi Smith to explore the possibility of working from home":

> I'm working out what is the best way to work remotely for dispatch and wanted to see what options were available with regards to order copies. My initial plan was just to go into the office before anyone arrives daily to get the orders since they don't want me exposed to Covid or any illnesses that cause congestion, etc..right now.
>
> I have already tested that I can print to the label and BOL printers so we are good there.
>
> While talking to Sean, he asked if I had talked to you to see if there was a way to have a high capacity printer sent to me and a PDF file could be sent from SAP where I could just print the orders daily; thereby, totally keeping me from being exposed.
>
> What are your thoughts?  Is that an option or would that entail too much?
>
> I'm not far from the office and can make whatever needs to happen work for me to get the orders, even if I have to suit up like I'm heading to space LOL.

Docs. 24-2 ¶ 20; 27-1 at 8 ¶ 20; 32-6 at 2.  Smith responded that she could "talk to IT to see what options" were available but cautioned that she did not think a home printer

---

[2] Scotts contends that "[t]hese duties did not include dispatching."  Doc. 24-1 at 3 n.2 (citing Doc. 32 at 128).  However, the cited deposition testimony does not support this assertion.  Viera testified:

> Q: So you had performed some of your duties, but not all of those duties that we talked about earlier --
> A: That is correct.
> Q:  -- *that were a part of your dispatcher job*?
> A: That is correct.

Doc. 32 at 128:6-12 (emphasis added).

"would print the same format as if it were a network printer" and "the automated jobs [could] only have 1 printer assigned for pick tickets and BOL." Doc. 32-6 at 2.

Adam Davis, the Jackson Facility plant manager, "became aware of Viera's conversations with Smith, and discussed the feasibility of dispatching from home with" Elrod. Docs. 24-2 ¶ 21; 27-1 at 8 ¶ 21. "Based on his first-hand experience working at the [Jackson Facility] and his conversations with Elrod and Smith," Davis concluded that remote dispatching would not be feasible. Docs. 24-2 ¶ 21; 27-1 at 8 ¶ 21; 32-7 at 4. On January 25, 2022, Davis sent Viera an email summarizing his position:

> There is not a clear path to dispatch from home during the season. Our processes are very manual and require constant attention. There is no way possible that during the season dispatching remotely would be effective with our volumes. Our processes are too manual, it would be chaotic and would destroy the operation in this plant. We move too rapidly, make changes too frequently and have to deal with variables here at the site on the fly....this is not a realistic option.

Doc. 32-7 at 4 (alterations in original). Viera responded that dispatching "from home [was] not a big deal" and could "be done," citing Cindy Wheeler as an example of an employee who had dispatched remotely. *Id*. at 3; *see also* Doc. 32 at 114:1-25. Viera acknowledged that the "biggest obstacle would be access to orders," but she proposed two solutions to this problem: (1) that Scotts "provide [her] with a printer / scanner … to allow [her] to print the orders from home without having to come in at all" or (2) to "come [into the office] to obtain copies before anyone comes in." Doc. 32-7 at 3.

"Davis then contacted Regional Human Resources Manager Sam [Andersen] for assistance" evaluating Viera's request to work remotely." Docs. 24-2 ¶ 23; 27-1 at 9 ¶ 23. Viera sent Andersen an email summarizing her request to work remotely on February 7, 2022. Doc. 32-7 at 2. Viera stated that the primary "obstacle" to her request to work remotely "would be obtaining physical copies of the orders" she needed

-5-

to dispatch and reiterated that this "obstacle" could be overcome by providing her with a "high capacity printer / scanner" or going into the office before the other employees arrived to make copies of necessary orders.  *Id*.  She contended that the "only function of [her] duties that [she] would not be able to perform" herself was "assembling BOLs to be arranged on the board for the next shipping day" and that "any issues with product cuts or availability" could be handled over email, telephone, or instant message.  *Id*.

Andersen proceeded to do "a full review and assessment of [Viera's] request," including reviewing "the day-to-day job" of a dispatcher, considering the "season … demands" for the Jackson Facility "compared to other facilities," considering whether a remote dispatching request had ever been granted, and reviewing Viera's current medical restrictions.[3]  Docs. 24-2 ¶ 23; 27-1 at 9 ¶ 23; 30 at 23:1, 27:20-29:3.  Specifically, Andersen reviewed a January 14, 2022 note from Dr. Jane Tramontana, a pulmonologist, who recommended that Viera "work remotely … until Covid rates declin[ed] and she progresse[d] to a more improved state."  Docs. 30 at 28:13-18; 32-8.  Dr. Tramontana advised that Viera would "be re-evaluated in two months and recommendations [would] be adjusted based on her progress."  Doc. 32-8.  On February 2, 2022, Dr. Tramontana submitted a "work ability report," which stated that Viera needed to "work remotely" for at least three months and her "[p]rojected full duty date" was to be determined.  Doc. 3-7.

Additionally, Andersen considered whether Wheeler's request to work remotely for a limited time was successful.  Doc. 30 at 28:3-12.  Wheeler, a dispatcher at Scotts'

---

[3] Viera disputes that Andersen conducted a "full review" of her request because he did not reach out to discuss her request.  *See* Doc. 27-1 at 9 ¶ 23 (citing Doc. 30 at 29-30, 35).  Andersen testified that he saw no need to contact Viera about her request because it was "outlined in detail in her email" and "pretty straightforward."  Doc. 30 at 29:7-21.  Additionally, Viera was out on short-term disability.  *Id*.

Chester, South Carolina manufacturing facility, was permitted to work remotely after she contracted COVID-19 and was required to quarantine. Doc. 24-6 ¶ 7. "Scotts granted Wheeler's request in part because she would be released to return to work in less than two weeks [] and because her request fell outside Scotts' busy season." Doc. 24-2 ¶ 31; 27-1 at 11 ¶ 31. Moreover, "[t]he Chester Facility is significantly smaller than the [Jackson] Facility, producing less than half the amount of loads per day." Doc. 24-2 ¶ 31; 27-1 at 11 ¶ 31. April Prothero worked as the Regional Officer Manager at the Chester Facility and was responsible for coordinating Wheeler's remote work arrangement. Doc. 24-6 ¶¶ 4, 7. Prothero testified by affidavit that "[d]espite occurring outside Scotts' busy season and at a facility approximately half the size/volume of the [Jackson] Facility, Wheeler's brief remote work arrangement nonetheless resulted in substantial strain on the Chester Facility." Doc. 24-2 ¶ 30; 24-6 ¶ 10; 27-1 at 11 ¶ 30. Prothero testified that remote dispatching resulted in significant problems, "including but not limited to 'double-booked' loads, inefficiencies, confusion, processing errors and delayed communications" and it "placed additional work duties on Scotts' in-person staff members," which compromised "the Chester Facility's efficiency."[4]  Doc. 24-2 ¶ 30; 27-1 at 11 ¶ 30

---

[4] Viera contends these difficulties "were more specific to [] Wheeler herself" rather than the remote work arrangement. Doc. 27 at 17; *see also* Doc. 27-1 at 11 ¶ 30. But that is not supported by the testimony she cites. Viera testified that Prothero told her that the remote work arrangement was difficult because "Cindy sometimes forgot to advise them of changes she had made to dispatch" and the "drivers would show up for orders that were not ready." Doc. 32 at 120:4-10. While Wheeler's poor communication certainly contributed to the problems the Chester Facility experienced, Prothero's testimony by affidavit clarifies that poor communication was not the *only* cause of the decreased efficiency at the Chester Facility. Doc. 24-6 ¶ 12 ("When [Viera] contacted me, I briefly explained to her some – but not all – of the challenges resulting from [] Wheeler's temporary work-from-home arrangement."). Rather, "[b]ecause the overwhelming majority of the dispatcher's duties are manual, intricate, and require prompt response to real-time changes," Prothero concluded that "dispatching remotely" is not "operationally feasible." *Id*. ¶¶ 11, 14. In short, while Wheeler's poor communication skills might have been a factor in the Chester Facility's failed effort, the remote work arrangement itself—i.e., shifting in-person dispatching

After reviewing Viera's request, Andersen and Davis concluded that Viera could not perform the dispatching role remotely.  Docs. 24-2 ¶ 37; 27-1 at 13 ¶ 37; 30 at 28:23-29:3, 36:8-16.  More specifically, they concluded that "[t]he essential functions of the dispatcher job" were "primarily manual" and included tasks such as "organizing and color-coding orders for use by plant employees, revising hard-copy orders, cutting orders in light of communication received from production employees and sales employees, and printing and organizing labels other employees' reference during the distribution process."  Docs. 24-2 ¶ 37; 27-1 at 13 ¶ 37.  Because "dispatching remotely would require an in-person employee at the Facility to perform the dispatcher's required, on-site tasks," Andersen and Davis believed a remote work accommodation would create "additional work for existing employees and add[] complexity and confusion to daily tasks."[5]  Docs. 24-2 ¶ 37; 27-1 at 13 ¶ 37.

On February 21, 2022, Andersen emailed Viera stating that Scotts could not approve her request to work remotely:

> Thank you for your email and valuable insight on your request to return to work remotely full-time.  After a careful review of your most recent doctor's note and accommodation request, and in consideration of our current operation, business demands, and the responsibilities of a full-time dispatcher at the Jackson, GA facility, we cannot at this time accommodate your request to work full-time from home.  Unfortunately, the business requires a full-time dispatcher on-site, especially because operations have ramped up significantly (and will continue to) as we get into our in-season demands.
>
> At this time, it is recommended that you initiate a Long-Term Disability ("LTD") claim.

---

responsibilities to other employees and coordinating with an off-site dispatcher—substantially disrupted the Chester Facility's operations.

[5] Viera disputes Andersen's and Davis's conclusion that she could not perform her dispatching responsibilities remotely.  Doc. 27-1 at 13 ¶ 37.

Doc. 32-7 at 1.

In late February or early March 2022, Viera's "then existing healthcare benefits with Scotts ended, and she was accordingly provided notice pursuant to COBRA about [the] continuation of her benefits."  Doc. 24-2 ¶ 12; 27-1 at 5-6 ¶ 12.  Viera's COBRA benefits expired on August 31, 2023.  Doc. 32-13.

On September 8, 2022, after Viera exhausted her administrative remedies with the Equal Employment Opportunity Commission, she filed this suit against Scotts alleging failure to accommodate and adverse action claims under the ADA.  Doc. 3.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson*, 477 U.S. at 248.  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941

F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 324) (alterations in original). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.… The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### III.  DISCUSSION

Title I of the ADA makes it unlawful for employers to discriminate against an otherwise qualified individual based on her disability. 42 U.S.C. § 12112(a). Discrimination under the ADA includes an employer's failure to provide a reasonable accommodation and an adverse employment action against an employee because of

her disability.[6]  *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007). Viera argues that Scotts discriminated against her when it denied her request to work remotely and, as a result, required her "to transition from her group health insurance through her employment with Scotts to continuing health insurance coverage under COBRA."  Docs. 3 ¶¶ 36-63; 27 at 19.

To establish a prima facie case of discrimination, a plaintiff must show that she (1) is disabled, (2) is qualified, and (3) was discriminated against because of her disability.  *Holly*, 492 F.3d at 1255-56; *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023).  "[A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship."  *Holly*, 492 F.3d at 1262.  Scotts does not dispute that Viera was disabled.  Rather, Scotts argues that Viera was not qualified for the dispatcher position, her requested accommodations were unreasonable, and her requested accommodations would impose an undue hardship.  Doc. 24-1 at 3-13.

A "qualified individual" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  In other words, if the employee is unable to perform an essential function of her job, even with a reasonable accommodation, then she is not considered a qualified individual under the

---

[6] "The primary difference between a disparate-treatment claim and a failure-to-accommodate claim is that, under a disparate-treatment claim, the plaintiff must prove discriminatory intent, while a discriminatory motive is not necessary for a reasonable-accommodation claim."  *Taylor v. Amazon.Com, Inc.*, 2023 U.S. Dist. LEXIS 122564, at *18 (N.D. Ga. July 17, 2023); *see also Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *4 (11th Cir. Aug. 24, 2007); *E.E.O.C. v. Eckerd Corp.*, 2012 WL 2726766, at *4 (N.D. Ga. July 9, 2012).

ADA. *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). Whether a job function is essential is evaluated on a case-by-case basis by examining a number of factors. *Holly*, 492 F.3d at 1258. Consideration is given to the employer's written description of the disabled employee's job and the employer's judgment as to whether a job function is essential. *See* 42 U.S.C. § 12111(8); *Holly*, 492 F.3d at 1257. Other factors for consideration include (1) the amount of time spent performing the function; (2) the consequences of not requiring the employee to perform the function; (3) the work experience of former employees; (4) the current work experience of current employees in similar roles; and (5) the terms of a collective bargaining agreement, if available. *See* 29 C.F.R. § 1630.2(n).

First, the Court considers Scotts' judgment, including testimony from Viera's supervisor, Davis, and the dispatcher's job description. Scotts' position is clear: the dispatcher role included multiple "manual" tasks, such as "obtaining customer orders from the printer," "notating hard-copy customer orders and organizing them by hand for reference by other employees," "adjusting … hard-copy orders," and "coordinating with production employees and drivers in real-time." Doc. 24-1 at 5-6. Each of these manual tasks was an essential function of the dispatcher role. *Id*. Consequently, in-person attendance was an essential function of the dispatcher role. *Id*. Viera acknowledges that dispatchers were responsible for these manual tasks. Docs. 24-2 ¶¶ 4-5; 27-1 at 2 ¶¶ 4-5 ("Plaintiff does not dispute that the Facility receives orders via printer throughout the day and that one of Ms. Viera's *primary duties* was to process such orders, including sorting and color coding them as needed and then begin the dispatch process, which included assigning carriers to orders, printing labels and

applying them to pick tickets.") (emphasis added).  Furthermore, Viera's job description states that she was required to:

- Coordinate Scotts and Growing Media freight ensuring maximum efficiency as well as timely deliveries.

…

- Maintain and process[] all necessary records and paperwork to ensure that private fleet as well as contract carriers are in compliance with state, federal and local regulations. Confirm and/or process orders and bills of lading.

- Advise customers on delivery scheduling and order problems; … work with production personnel and other Growing Media Plants to coordinate shipments; responds to inquiries from customers, truck drivers, corporate personnel, etc.

Doc. 32-1 at 1; *see also* Docs. 32 at 22:4-13.  Thus, while the job description does not explicitly state that in-person attendance is required, the listed job duties require in-person attendance.  As Davis testified, allowing Viera to work remotely would require Scotts "to have somebody [at the Jackson Facility] constantly attending to her on the phone or email or chat."  Doc. 31 at 72:20-23.  In other words, Viera would need someone "to be her legs" to ensure these "manual" tasks were completed.  *Id*. at 73:3.  And in Davis's opinion, this would be "extremely chaotic," compromise "efficiency," and "hinder … how [the Jackson Facility] operate[s]."  *Id*. at 73:4-7.  In sum, this factor weighs in favor of finding that the manual tasks were an essential function of the dispatcher role and that in-person attendance was required to accomplish these functions.

Next, the Court considers the amount of time Viera spent performing the "manual" portions of her job and the consequences of not requiring her to perform these functions.  These factors weigh heavily in Scotts' favor.  It is undisputed that dispatchers

-13-

are required to complete these manual tasks as a part of their daily responsibilities. *See* Docs. 24-2 ¶¶ 4-5; 27-1 at 2 ¶¶ 4-5; 32 at 23:18-47:9.  And it is undisputed that if Viera did not perform these tasks another employee would have to pick up the slack.  Doc. 28-1 ¶ 20 (Viera testifying that a temporary employee would need to assist her with at least five distinct, physical tasks); *see also* Docs. 24-6 ¶¶ 10-11; 31 at 72:20-73:7.  Nevertheless, Viera contends this factor weighs in her favor because Scotts "always hires temporary office workers to help out during its peak season" and other full-time office staff often helped her with these duties.  Doc. 27 at 7-8.  But this argument misses the mark.  While other employees may have assisted Viera with these tasks, they remained the responsibility of the dispatcher to complete.  The ADA does not require Scotts to reallocate the essential functions of Viera's job to other employees.  *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005); *Johnson v. Ga. Dep't of Hum. Res.*, 983 F. Supp. 1464, 1471 (N.D. Ga. 1996); *Everett v. Grady Mem'l Hosp. Corp.*, 703 F. App'x 938, 946 (11th Cir. 2017).

      The Court also considers the work experience of other dispatchers.  Viera argues that Scotts' decision to allow Wheeler to work remotely while she quarantined contradicts its contention that "'in-person' attendance is critical to a dispatcher's job duties."  Doc. 27 at 16-17.  The Court disagrees.  First, Wheeler's request to work remotely for two weeks at Scotts' smaller Chester Facility during its off-season differs substantially from Viera's request to work remotely at Scotts' largest facility indefinitely during its busy season.[7]  Doc. 24-2 ¶ 31; 27-1 at 11 ¶ 31.  Second, it is undisputed that

---

[7] Viera contends that her "restriction to working from home was not for an 'indefinite' duration; rather it was temporary until the COVID-19 rates declined and she would be re-evaluated by her treating physician in two to three months."  Doc. 27-1 at 16 ¶ 12.  But Viera's request is the textbook definition of indefinite: "not clearly defined or determined."  *Indefinite*, Dictionary.com,

-14-

Wheeler's "remote work arrangement … resulted in substantial strain on the Chester Facility," "placed additional work duties on Scotts' in person staff members," and "compromise[ed] the Chester Facility's efficiency."  Doc. 24-2 ¶ 30; 27-1 at 11 ¶ 30.  Thus, the difficulty Scotts experienced accommodating Wheeler's request to work remotely, for a limited time, at a much smaller facility, and during the off-season, supports its conclusion that Viera would not be able to perform the essential functions of the dispatcher role remotely.

Still, Viera contends that in-person attendance was not required for her to perform the essential functions of her job because she performed "some of her job duties from home" while on leave.  Doc. 27 at 6-7.  Specifically, Viera testified that she "did carrier negotiations, rate negotiations, [and] on-boarding of carriers," prior to her request to work remotely full-time.  Doc. 32 at 127:24-128:5.  But, again, Viera's argument fails to address the key issue—while Viera could perform some of her job duties from home she could not perform multiple essential functions of her job from home.  For example, even if Viera was able to print orders from home or obtained the orders before the start of the workday from the office, she testified that she would still need an on-site employee "to assist [her] by: (a) pulling or printing dispatched pick tickets …; (b) writing assigned carrier and dispatch date or any other loading or delivery requirements on pick tickets; (c) physically attaching bills of lading and labels to the pick tickets and placing them on the board accordingly; (d) pulling any loads from the board which require changes due to production issue and printing new pick tickets [she] sent

---

https://www.dictionary.com/browse/indefinite (last visited June 11, 2024).  In fact, as of July 2023, Viera remained medically restricted to working exclusively from home.  Doc. 32 at 99:2-7.  The mere prospect of re-evaluation did not make Viera's request temporary and, thus, her request to work remotely was for an indefinite period.

via email and attaching corrected pick ticket and bills of lading to be added back to the board; and (e) assisting with any other on-site duties such as changing carriers on load(s) that are on the board, providing [her] with the daily count of loads remaining for each carrier at the end of the work day, and moving loads to another dispatch day." Doc. 28-1 ¶ 20.  In short, Viera's acknowledgment that someone would need to be present at the Jackson Facility to accomplish her manual tasks undermines her assertion that in-person attendance was not an essential function of the dispatcher role. *Geter v. Schneider Nat'l Carriers, Inc.*, 2023 WL 7321610, at *13 (11th Cir. Nov. 7, 2023).

In sum, the essential functions of a dispatcher involve multiple manual tasks, which a dispatcher working remotely could not perform, with or without a reasonable accommodation.  Thus, Viera has not demonstrated that she is a qualified individual.

It necessarily follows that Scotts did not fail to provide Viera a reasonable accommodation.  The employee, at the summary judgment stage, bears the burden of producing evidence that a reasonable accommodation was available.  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-56 (11th Cir. 2001).  "An accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job."  *Lucas*, 257 F.3d at 1255.  Where an employee cannot identify a reasonable accommodation, "the employer has no affirmative duty to show undue hardship."  *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016).  Because the Court concludes that in-person attendance was required to perform the essential functions of the dispatching position, Viera's requested

accommodation—working from home full time—was not reasonable.[8]  "Other employees necessarily would have had to take on, at least temporarily, [the manual] aspects of [Viera's] job.  And 'the ADA does not require the employer to eliminate an essential function of the plaintiff's job' or place it upon someone else."[9]  *Everett*, 703 F. App'x at 946 (quoting *D'Angelo*, 422 F.3d at 1229).  In fact, reassigning the essential functions of Viera's job to another employee would constitute an undue burden.  *Mize v. Centura Fin. Servs.*, 2009 WL 3419586, at *10 (S.D. Ala. Oct. 21, 2009) ("[C]ourts have routinely found that requiring an employer to reassign an existing employee to help a disabled employee with an essential function of his or her job 'is an unreasonable accommodation as a matter of law because it creates an undue burden on [the employer.]'") (collecting cases) (quoting *Merrell v. ICEE-USA Corp.*, 242 F.3d 389 (10th Cir. 2000)).  For these reasons, Scotts is entitled to summary judgment on Viera's failure to accommodate claim.[10]

---

[8] To the extent Viera argues in her brief that she requested Scotts "purchase her an oxygen concentrator for her use at the office and create a space for her where she could work while being separated from other office employees," that argument is contradicted by her deposition testimony.  *See* Doc. 27 at 12.  When asked during her deposition if she "request[ed] that the company permit [her] to work in person while using [an] oxygen concentrator," Viera answered "It was not a formal request.  It was a mention in a conversation that I had between Amy and Adam."  Doc. 32 at 104:20-25.  Furthermore, Viera testified that this request "would not have complied with" her physician's work restrictions.  *Id*. at 105:1-5.

[9] Viera's argument that Scotts was required and failed to engage in the interactive process to determine a reasonable accommodation also fails.  Doc. 27 at 17-18.  "[W]here a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant."  *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997).

[10] Viera also argues that Scotts' failure to consider her request under its "Modified Work Program Policy" and "Flexible Work Practices and Home Based Associates" policy violates the ADA.  Doc. 27 at 14-15.  Viera does not quite explain why or how these policies give rise to an ADA claim.  In any event, neither policy applies to Viera.  Scotts' Modified Work Program Policy applies when "[t]he duration of the associate's work restrictions is for a specific period of time."  Doc. 3-13 at 2.  As discussed, Viera's request to work remotely was for an indefinite period.  Scotts' Flexible Work Practices and Home Based Associates policy does not apply to "associates being paid on a fluctuating work week schedule" or "in circumstances where the [FMLA] Policy … or the [ADA] Policy Statement apply."  Doc. 3-14 at 1-2.  Viera was paid "on a fluctuating workweek schedule" and her accommodation request was considered under Scotts' FMLA and ADA policies.  Doc. 30 at 68:10-21, 69:17-19.

To the extent Viera argues that Scotts discriminated against her outside of the context of her request to work remotely, i.e., an adverse action claim, Scotts is also entitled to summary judgment because Viera cannot demonstrate that she was qualified to perform the essential duties of the dispatcher position.  *See* Docs. 3 ¶¶ 49-63; 27 at 18-19.

### IV. CONCLUSION

For the reasons discussed, Scotts' motion for summary judgment (Doc. 24) is **GRANTED.**

**SO ORDERED**, this 9th day of July, 2024.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT